1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

SONJA GABALES individually,
10  and as Personal Representative
of the Estate of Philip
11  Gabales; L.C., a minor, by and
through her Guardian Ad Litem,
12  SONJA GABALES,

13                                    NO. CIV. S-07-1346 LKK/DAD
          Plaintiffs,
14
      v.
15                                    O R D E R
COUNTY OF SAN JOAQUIN, a
16  municipal corporation; ROBERT
HEIDLEBACH, in his capacity as
17  Sheriff for the COUNTY OF SAN
JOAQUIN; ROBERT FOPPIANO,
18  individually and in his capacity
as a deputy sheriff for the
19  COUNTY OF SAN JOAQUIN; WILLIAM
INSKIP, individually; MATTHEW
20  D'VALENTINE, individually, and
DOES 1-50, inclusive,

21
          Defendants.
22  _____/

23        This case concerns the death of Philip Gabales during his

24  encounter with defendant law enforcement officers. Plaintiffs, the

25  decedent's family members, have brought claims under 42 U.S.C. §

26  1983, California Civil Code §§ 51.7 and 52.1 and California tort

1

1   law. Defendants are the County of San Joaquin, Sheriff Heidelbach,

2   Deputy Sheriff Foppiano, California Highway Patrol officer Inskip,

3   and California Youth Authority officer D'Valentine. Pending before

4   the court are motions for summary judgment on all claims brought

5   by all defendants. The court resolves the motions on the papers and

6   after oral argument.

### I. BACKGROUND AND FACTS

**A.   Facts**[1]

9       On December 20, 2005, the decedent Philip Gabales was

10  traveling in a truck with an attached trailer, heading eastbound

11  on State Road 26 in San Joaquin County. As he approached the

12  intersection of Jack Tone Road, defendants Foppiano and Inskip

13  observed him as they were traveling northbound on that road.

14  Foppiano and Inskip were in an unmarked police car. The

15  intersection between the roads is a four-way stop.

16      Inskip has testified that decedent's truck approached the stop

17  sign at approximately seventy miles per hour. Decl. of James Walter

18  In Support of Defs.' Mot. for Summ. J. ("Walter Decl.") Ex. G

19  (Inskip Depo.) at 32:11-14. According to defendants, the decedent's

---

[1]All facts are undisputed unless otherwise noted. Each party has objected to several items of the other's evidence. Many of these relate to evidence not relied on by the court in ruling on the instant motion. To the extent that the evidence is relied on, the objections are OVERRULED.

On August 27, 2009, plaintiffs filed a document entitled "Response to Reply to Opposition To Inskip and D'Valentine's Motion for Summary Judgment." The Local Rules do not provide for responses to replies to be filed as a matter of course, see Local Rule 78-230, and plaintiffs did not seek leave to file a sur-reply. The court, therefore, disregards it.

1    truck continued through the intersection at that speed. Id. at

2    35:2-12; id. Ex. H (Foppiano Depo.) at 74:4-12. Foppiano testified

3    that he and Inskip watched the truck and observed its trailer

4    "working into the opposing lane of traffic." Foppoano Depo. at

5    76:2-4. Decedent also passed the cars in front of him by traveling

6    in the opposing traffic lane. Id. at 77:4-8. Inskip testified that

7    he observed decedent's truck traveling in the opposing lane even

8    when he was not apparently attempting to pass another car. Inskip

9    Depo. at 35:23-36:8.

10        Inskip and Foppiano then decided to make a traffic stop of

11   decedent. Foppiano testified that decedent's conduct "was

12   jeopardizing people's safety" and that he "made a decision to . .

13   . find out what was wrong with him." Foppiano Depo. at 75:24-76:20.

14   They caught up with decedent's vehicle and Foppiano activated the

15   emergency lights in the police car. Id. at 77:12-78:4. The decedent

16   pulled the truck over to the shoulder of the road and stopped.

17        Inskip testified that he then approached decedent's vehicle

18   on the right side and showed his identification badge through the

19   passenger's window. Inskip Depo. at 39:16-22. Foppiano testified

20   that he approached the driver's side of the truck. Foppiano Depo.

21   at 88-1-14. At the time, both Inskip and Foppiano were not in

22   uniform, although they each were wearing a badge and a gun belt.

23   Inskip also had his California Highway Patrol identification around

24   his neck.

25        Inskip testified that when he approached the truck, he

26   identified himself, advised decedent why they stopped him, and

asked for identification from him. Inskip Depo. at 43:14-17.
According to Inskip, the decedent reached for his wallet and told
Inskip that he was coming from Stockton, "had been in some kind of
fight and that people were chasing him." Id. at 43:18-20; 45:8-12.
Inskip testified that he did not recall the decedent having any
injuries at the time. Id. at 45:17-19. Inskip then asked the
decedent to get out of the vehicle and speak to Foppiano. Id. at
45:20-24. Inskip and Foppiano spoke to him outside of the truck.
Id. at 48:10-14. Inskip described the decedent's behavior as
"somewhat odd" and that he "was kind of crowding" the officers. Id.
at 48:10-23. Based on this, they decided to handcuff him and detain
him. Id.

Foppiano testified that during their conversation decedent was
not making sense and showed the officers his wallet, asking them
to take it. Foppiano Depo. at 95:5-17. Foppiano told him to put his
wallet away and the decedent again offered it, saying "take my
money, take my money." Id. at 96:15-20. It was Foppiano's
impression that the decedent believed they were robbing him. Id.
at 96:21-23.

The decedent then began to cross the road and Foppiano grabbed
him by his clothing and pulled him back towards the truck. Id. at
99:15-19. The decedent pulled away and a struggle began, in which
Foppiano attempted to pull the decedent to the ground. Id. at
100:6-19. The decedent did not strike, push, or shove Foppiano
during the struggle. Id. at 101:4-9. Eventually, Inskip came to
Foppiano's assistance and together they attempted to move the

4

1 decedent off of the road. Id. at 100:20-101:3. The decedent
2 continued to struggle and both officers testified that they decided
3 to release him rather than risk being pushed into traffic. Id. at
4 101:11-24; Inskip Depo. at 50:11-21.

5     The decedent then ran through the road, into lanes of traffic,
6 and into the agricultural fields adjacent to the road. As he ran,
7 the officers observed him yelling into the collar of his shirt, as
8 if speaking into a radio, saying "Get me backup" or "I need
9 backup." Inskip and Foppiano then retrieved their police vests from
10 their vehicle. Inskip began pursuing the decedent on foot while
11 Foppiano pursued him in the vehicle. As he fled, the decedent
12 approached a compact truck driven by Gloria Perez and attempted to
13 get in through the driver's side door. He was not successful.

14     He then ran to a house on a nearby street, where the owner was
15 in the yard. He pushed her out of his way and attempted to enter
16 the house. The homeowner testified that it appeared that the
17 decedent "just wanted to get away from the police." Walter Decl.
18 Ex. J (Lindgern Depo.) at 27:4-10.

19     Inskip and Foppiano arrived shortly thereafter. Foppiano
20 approached the decedent and sprayed him with pepper spray. He
21 testified that the spray did not appear to have an effect on the
22 decedent, who continued to resist Foppiano. Foppiano Depo. at
23 113:22-25; Inskip Depo. at 62:21-25. Foppiano and Inskip then
24 wrestled the decedent to the ground, while the decedent struggled
25 to free himself. Foppiano Depo. at 114:16-22; Inskip Depo. at
26 61:17-23. During this time, however, the decedent did not swing at

1   or attempt to punch Foppiano and Foppiano did not believe the

2   decedent was armed. Foppiano Depo. at 115:10-13, 117:5-7. Once the

3   decedent was on the ground, Foppiano and Inskip each attempted to

4   pull his arms from underneath him and place handcuffs on him. Id.

5   at 115:21-116:1; Inskip Depo. at 65:2-5. The decedent was laying

6   on his stomach. Foppiano Depo. at 116:13-15; Iskip Depo. at 64:17-

7   20. Foppiano testified that his knee may have been on the

8   decedent's back at the time. Foppiano Depo. at 118:20-119:4.

9       According to Foppiano, during this struggle the decedent

10  grabbed a magazine from Foppiano's vest. Id. at 117:17-21. Foppiano

11  then struck the decedent several times with his baton. Foppiano

12  Depo. at 119:7-25. He testified that he struck him six to eight

13  times in the shoulders and back, but could not recall whether he

14  struck him in the neck. Id. at 119:21-121:2. He testified that he

15  did not strike the decedent in the head. Id. at 120:20-121:2.

16  Plaintiff has tendered evidence, however, that in a prior, recorded

17  interview about the incident with detectives in the Sheriff's

18  Office, Foppiano stated that he struck the decedent, "many times

19  in the back area, the right elbow, striking him non-intentionally

20  in the back of the neck, once that I can recall in the back of the

21  head." Decl. of Benjamin Nisenbaum In Opp'n to Defs.' Mots.' for

22  Summ. J. ("Nisenbaum Decl.") Ex. BB at 11:12-23. He also stated

23  that he recalled using the pepper spray on the decedent a second

24  time, when the decedent was on the ground during the struggle. Id.

25  at 11:7-8.

26      According to Inskip, during this time he was crouched on the

6

1  other side of the decedent, trying to gain control of his arms.

2  Inskip Depo. at 67:6-25. He observed Foppiano strike the decedent

3  five to ten times with his baton, but did not recall seeing the

4  decedent struck in the head. Id. at 68:3-14. In his interview with

5  the Sheriff's Department about the incident, Inskip stated that

6  during the struggle, he was sitting on the decedent's legs while

7  trying to gain control of his arms. Nisenbaum Decl. Ex. AA at 13:6-

8  7. He also stated that during the struggle the decedent began to

9  bleed from the face area and he recalled having hit the decedent

10 on the side or back of his head during the struggle. Id. at 25:20-

11 24. Based on the decedent's behavior, Inskip concluded that he was

12 "51/50" or intoxicated. Id. at 36:1-16.

13      At some point during the incident, defendant D'Valentine

14 arrived. Foppiano Depo. at 122:20-25. D'Valentine was employed as

15 a correctional counselor with the California Youth Authority. He

16 was driving by during the incident and, when he saw the decedent

17 approach the house, he parked his car and went to the driveway to

18 see if the officers needed assistance. Walter Decl. Ex. I

19 (D'Valentine Depo.) at 44:22-45:10.

20      When he arrived, the decedent was on the ground with his hands

21 underneath him. Nisenbaum Decl. Ex. C (D'Valentine Depo.) at 45:23-

22 46:9. Foppiano and Inskip were each kneeling or crouching on either

23 side of the decedent. Id. at 46:19-47:2. He saw one of the officers

24 strike the decedent's shoulder and arm area with a baton

25 approximately four or five times. Id. at 49:2-8, 50:1-4. He did not

26 see the officer strike the decedent in the head. Id. at 50:5-8.

7

1   D'Valentine attempted to restrain decedent's legs and testified
2   that at one point the decedent grabbed his throat. Id. at 56:23-
3   57:11. At that time, the decedent's arm had blood on it. Id. In his
4   interview with the Sheriff's Department after, D'Valentine stated
5   that during the struggle he put his knee across the decedent's
6   shoulder while he and the other officers pulled the decedent's left
7   arm from underneath him. Nisenbaum Decl. Ex. CC at 15:18-22.
8   Eventually, the officers handcuffed the decedent. D'Valentine
9   testified that afterwards, the decedent was "talking about his
10  wallet and calling for backup." D'Valentine Depo. at 80:11-19.

11      Several people stopped nearby to watch the incident as it
12  occurred, among them Lino Garcia. Nisenbaum Decl. Ex. F (Garcia
13  Depo.) at 19:10-24, 24:2-15. Garcia observed the officers "hitting
14  [a] guy" and he called 911 because he believed that "[t]hey were
15  using too much force . . . they were hitting him too much." Id. at
16  24:17-25:16. He saw that the decedent was on the ground, with his
17  face towards the ground. Id. at 31:11-32:1. He testified that he
18  saw one of the officers hit the decedent in the head with a baton
19  while the decedent's arms were at his back. Id. at 32:5-25, 34:9-
20  16. At the time he saw an officer hit the decedent on the head, the
21  decedent was not moving and his arms were being held by an officer,
22  possibly with the officer's knee. Id. at 34:9-24, 38:3-9. At the
23  same time, a second officer was kicking the decedent. Id. at 38:18-
24  24.

25      The woman in whose driveway this incident occurred was Andrea
26  Lindgern. See Lindgern Depo. at 23:14-25. According to her

1   testimony, one of the officers struck the decedent four or five
2   times while he was still standing. Id. at 38:18-39:16. The officers
3   sprayed pepper spray at the decedent at least twice, although it
4   appeared to have no effect. Id. at 40:4-19. After the decedent went
5   to the ground, she did not observe him struggle at all. Id. at
6   43:1-5.

7        Shortly after the decedent was handcuffed, Mrs. Lindgern
8   noticed that he appeared unconscious. According to her, she looked
9   down and noticed that he was vomiting while he was still lying face
10  down on the ground. Id. at 51:19-53:14. She reached down and felt
11  his neck for a pulse, but could not find one. Id. at 53:18-23.
12  Until that point, she did not see any of the officers check the
13  decedent's vital signs. Id. at 55:10-18; see also id. at 46:5-21.

14       Lindgern informed the officers that decedent was unconscious.
15  The officers requested emergency medical assistance and performed
16  CPR until the paramedics arrived.[2] Decedent was pronounced dead
17  shortly thereafter.

18       Plaintiffs have tendered a report of  Dr. David Posey, in
19  which he concluded that the decedent's cause of death was "Cocaine
20  ingestion complicated by exhaustion due to extreme physical and
21  emotional stress; prone positioning (with hands cuffed behind
22  back); asphyxia due to aspiration of gastric contents; inability
23  to cough, breathe or protect airway; and fatal ischemic cardiac

24  _____

25       [2]Plaintiffs purport to dispute this, but have not tendered
    evidence in support of the asserted dispute. See Pls.' Objections
26  to Defs.' Statement of Undisputed Facts ¶ 40.

arrhythmia with cardiac arrest." Report of David Posey at 8.
Defendants have tendered the expert report of Dr. Robert Lawrence,
in which he concluded that the cause of death was "hypoxic cardiac
arrhythmia due to aspiration of vomitus, due to violent struggle
with police, with the underlying cause of cocaine intoxication."
Report of Robert Lawrence at 1. This was what the San Joaquin
County Sheriff's coroner's report had concluded was the cause of
death. Walter Decl. Ex. Q (Lawrence Depo. Ex. B). The coroner's
report also described the decedent as having blunt force injuries
on his face, head, shoulders, knees, and back, among others. Id.

**B.    Procedural History**

Sonja Gabales, the decedent's wife, commenced this action in
July 2007. Also named as a plaintiff was the minor L.C. Plaintiff
Ted Gabales is the decedent's father. He instituted a second action
on behalf of himself and S.V.G.G. and P.S.G., identified as the
decedent's minor children. The two complaints alleged identical
causes of action and, accordingly, the cases were consolidated in
December 2007.

**II. STANDARD FOR A MOTION FOR SUMMARY JUDGMENT UNDER FEDERAL
RULE OF CIVIL PROCEDURE 56(C)**

Summary judgment is appropriate when it is demonstrated that
there exists no genuine issue as to any material fact, and that the
moving party is entitled to judgment as a matter of law.  Fed. R.
Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144,
157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir.
1995).

1          Under summary judgment practice, the moving party

2          [A]lways bears the initial responsibility of informing
           the district court of the basis for its motion, and
3          identifying those portions of "the pleadings,
           depositions, answers to interrogatories, and admissions
4          on file, together with the affidavits, if any," which it
           believes demonstrate the absence of a genuine issue of
5          material fact.

6  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the

7  nonmoving party will bear the burden of proof at trial on a

8  dispositive issue, a summary judgment motion may properly be made

9  in reliance solely on the 'pleadings, depositions, answers to

10 interrogatories, and admissions on file.'" Id. Indeed, summary

11 judgment should be entered, after adequate time for discovery and

12 upon motion, against a party who fails to make a showing sufficient

13 to establish the existence of an element essential to that party's

14 case, and on which that party will bear the burden of proof at

15 trial. See id. at 322. "[A] complete failure of proof concerning

16 an essential element of the nonmoving party's case necessarily

17 renders all other facts immaterial." Id.  In such a circumstance,

18 summary judgment should be granted, "so long as whatever is before

19 the district court demonstrates that the standard for entry of

20 summary judgment, as set forth in Rule 56(c), is satisfied." Id.

21 at 323.

22         If the moving party meets its initial responsibility, the

23 burden then shifts to the opposing party to establish that a

24 genuine issue as to any material fact actually does exist.

25 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

26 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

11

391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec.Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party,Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); see also In re Citric Acid Litigation, 191 F.3d 1090, 1093 (9th Cir. 1999). The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court

12

must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)); see also Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

## III. ANALYSIS

The defendants move for summary judgment on all of plaintiffs' causes of action, which plaintiffs oppose. As described below, the court grants the motion in part and denies it in part.

### A.    Causes of Action Under 42 U.S.C. § 1983

In their first, second, and third causes of action, plaintiffs allege that defendants violated the decedent's civil rights by using excessive force against him, in violation of 42 U.S.C. § 1983. Defendants seek summary judgment on the grounds that the force was not excessive, the individual officers are entitled to qualified immunity, and there is insufficient evidence of the liability of the County or Sheriff Heidlebach. The court considers each argument in turn.

### 1.    Sufficiency of the Evidence

In analyzing a § 1983 claim alleging excessive force during a seizure, the court employs the Fourth Amendment's reasonableness standard. Graham v. Connor, 490 U.S. 386, 394-95 (1989). To

1  determine whether the force used to effectuate a seizure was
2  reasonable, the court balances "the nature and quality of the
3  intrusion into the individual's Fourth Amendment interests against
4  the countervailing government interests at stake." Id. at 396
5  (citations omitted). This analysis is necessarily fact-specific and
6  requires consideration of the severity of the crime at issue,
7  whether the suspect posed a threat to officers or others, and
8  whether the suspect was actively resisting or fleeing. Id. The
9  reasonableness of the officer's conduct is gauged by his
10  perspective of the facts at the time of the incident, accounting
11  for the fact that "police officers are often forced to make split-
12  second judgments-in circumstances that are tense, uncertain, and
13  rapidly evolving-about the amount of force that is necessary in a
14  particular situation." Id. at 397. Nevertheless, the reasonableness
15  inquiry remains an objective one, so that the officer's motivation
16  or intent is not relevant. Id.

17      The use of deadly force is analyzed under substantially the
18  same standard, although the court's principle inquiry should be
19  whether the suspect posed a "threat of serious physical harm."
20  Tennessee v. Garner, 471 U.S. 1, 11 (1985). Even so, deadly force
21  should only be used "if necessary to prevent escape" and if a
22  warning has been given, if doing so is feasible. Id. at 11-12. This
23  modification of the reasonableness standard should not be employed
24  in every case in which death of the suspect resulted. Vera Cruz v.
25  Escondido, 139 F.3d 659, 661 (9th Cir. 1997), overruled on other
26  grounds by Smith v. City of Hemet, 394 F.3d 689 (9th Cir. 2005)).

Instead, "deadly force is that force which is reasonably likely to cause death." Id. at 663.

The question of the reasonableness of an officer's force is typically left for a jury. See, e.g., Blankenhorn v. City of Orange, 485 F.3d 463, 477-78 (9th Cir. 2007); Santos v. Gates, 287 F.3d 846, 852 (9th Cir. 2002); White by White v. Pierce County, 797 F.2d 812, 816 (9th Cir. 1986). As the Court of Appeals has explained,

> because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be used sparingly. This is because such cases almost always turn on a jury's credibility determinations.

Davis v. City of Las Vegas, 478 F.3d 1048, 1054-55 (9th Cir. 2007) (internal citation omitted).

Summary judgment may be granted in a defendant's favor, however, if the court concludes that even after drawing all inferences in plaintiff's favor, the defendant did not use unreasonable force. White, 797 F.2d at 816. For example, the Court of Appeals has held that summary judgment was proper where there was no evidence that the suspect was injured, struck or beaten. Id.; see also Tatum v. City and County of San Francisco, 441 F.3d 1090, 1097 (9th Cir. 2006) (defendant's use of force was objectively reasonable, where the only evidence was that the officer had placed the suspect in handcuffs and had not "punched or kicked" him nor threatened lethal force). The Court of Appeals

has also found summary judgment proper where the plaintiff's own testimony established that the officers were attempting to maintain order in an escalating "melee" of fights among thirty people and the officers' intrusion on the plaintiff's person -- spraying chemical irritant into her hair and placing her in a police car -- was "minimal." <u>Jackson v. City of Bremerton</u>, 268 F.3d 646, 652 (9th Cir. 2001). Finally, the court has held that the use of deadly force was reasonable where the decedent disobeyed officers' orders to drop his weapon (there, a two and a half-foot sword) as he attempted to enter a house and its yard. <u>Blanford v. Sacramento County</u>, 406 F.3d 1110, 1116-17 (9th Cir. 2005); <u>see also</u> <u>Billington v. Smith</u>, 292 F.3d 1177, 1185 (9th Cir. 2002) (officer's use of deadly force was reasonable where suspect had attacked officer and attempted to wrestle his gun away from him).[3]

Here, defendants have not shown that the facts and circumstances, when drawing all interferences in favor of the plaintiffs, render this case one of the rare instances where summary judgment in favor of the defendants is proper. <u>See</u> <u>Davis</u>, 478 F.3d at 1054-55. First, based on the evidence tendered, a factfinder could reasonably conclude that defendants Inskip,

_____

[3]On the other hand, the court has held that summary judgment should be granted for the plaintiff where he was slammed head-first into two walls, kneed in the back, and punched in the face, all while handcuffed, on suspicion of trespass and obstruction of a police officer. <u>Davis</u>, 478 F.3d at 1055-56; <u>see also</u> <u>Drummond ex rel. Drummond v. City of Anaheim</u>, 343 F.3d 1052, 1059-60 (9th Cir. 2003) (officers' use of force was "constitutionally excessive" where plaintiff had not been suspected of a crime, was not resisting the officers, and where officers had "crushed him against the ground" while he was face-down and handcuffed).

Foppiano, and D'Valentine used an exceptional amount of force on the decedent. See Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994) (in applying Graham, the court first considers the quantum of force used). According to the defendants' testimony, both Foppiano and Inskip pulled the decedent to the ground. They, and later D'Valentine as well, struggled with the decedent while he was lying face-down on his stomach. There is evidence that at least one of the defendants had his knee in decedent's back. During this time, Foppiano also began striking decedent several times in his back and shoulders; there is also some evidence that he struck him in the head with the baton, as well. Inskip struck him in the head with his hand. There were blunt force injuries over decedent's head, face, shoulders, and back as a result. Based on all of these facts, the court must conclude that whether excessive force was used is for the jury. See Jackson, 268 F.3d at 652; White, 797 F.2d at 816; Tatum, 441 F.3d at 1097; cf. Drummond, 343 F.3d at 1059-60 (officers' force was constitutionally excessive as a matter of law, where officers crushed decedent to the ground while he was lying prone).[4]

Next, the court considers "the single most important" of the Graham factors: whether the suspect posed an immediate threat to the safety of the officers or others. Chew, 27 F.3d at 1441. There is undisputed evidence that the decedent attempted to pull a woman

---

[4]While the court seriously expects it knows what a reasonable jury will do, such expectations are not the basis for summary judgment.

1  out of a car during his flight from the officers. From this, a
2  factfinder could conclude that the officers reasonably perceived
3  that he posed a threat to persons he encountered in the flight from
4  the officers. This conclusion, however, is not compelled by the
5  facts. The evidence is undisputed that the decedent was unarmed at
6  the time of the officers' struggle with him. Defendants' Inskip and
7  Foppiano's testimony was that the decedent did not strike or attack
8  either of them during the initial skirmish at the traffic stop or
9  during the second incident in Andrea Lindgern's driveway. Instead,
10 their testimony was that the decedent was continually struggling
11 to free himself from the officers. Finally, there is evidence that
12 when the decedent approached Lindgern in front of her house, he did
13 not put her in fear of her safety but rather simply was endeavoring
14 to get away from the officers.

15      This testimony accords with the evidence that the decedent did
16 not realize that Inskip or Foppiano were police officers, given
17 that they stopped his vehicle while in an unmarked police car and
18 in plain clothes. This is supported by defendants' testimony that
19 decedent attempted to give them his wallet during the initial
20 traffic stop. In light of all of these facts, a reasonable jury
21 might find that the decedent posed little threat to the officers
22 or others at the time that the officers brought him to the ground
23 and struggled with him there, but rather that he had attempted to
24 flee persons that he believed to be robbing him.[5]

25 _____

26      [5]Nevertheless, it is not clear to the court what actions the
    officers could have taken other than attempting to pursue him. The

18

1    The remaining <u>Graham</u> factors weigh in favor of the defendants,

2   however. The undisputed evidence is that the decedent fled from a

3   traffic stop and resisted the officers at the time of the stop and

4   when approached again in the Lindgren driveway. Moreover, it is

5   undisputed that decedent drove at least somewhat unsafely,

6   attempted to pull a woman from her car and enter it, and attempted

7   to enter the house of another. This conduct, possibly encompassing

8   several felonies, represents "sever[e]" crime underlying the

9   officers' pursuit of and use of force against the decedent. <u>See</u>

10  <u>Graham</u>, 490 U.S. at 396.

11   Balancing these factors is traditionally a jury's function

12  and, here, the balance does not weigh so strongly and unequivocally

13  in the defendants' favor to conclude that summary judgment is

14  appropriate. <u>See</u> <u>Blankenhorn</u>, 485 F.3d at 477-78. Instead, the jury

15  must sort through the facts as the officers knew them and, from

16  them, infer what a reasonable officer's perception and resultant

17  conduct would have been. Given that reconstruction of the series

18  of events leading to decedent's death, and the reasonable

19  inferences thereof, relies on consideration of the credibility of

20  several witnesses, including the defendants', deference to the jury

21  to resolve those issues is appropriate here.

22       **2.   Qualified Immunity**

23   Defendants Inskip, D'Valentine, and Foppiano assert that they

24  are entitled to qualified immunity for plaintiffs' § 1983 claims.

25  ────────────────

26  question is, however, whether excess force was used – a jury
    question.

A government official is immune from liability for discretionary functions, so long as the official's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Plaintiffs here do not dispute that the City defendants were engaging in discretionary functions, for the purposes of the qualified immunity analysis.

The determination of whether or not a state official enjoys qualified immunity proceeds in two parts. First, the court must determine whether the facts show that the official's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). If so, the court undertakes the second step of the analysis, which is whether the constitutional right was "clearly established" at the time of the violation. Id. A right is clearly established if a reasonable official would have understood that his actions violated that right. Id. at 202. The plaintiff bears the burden to show that the law regarding the Constitutional violation was settled at the time of the violation. Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir. 1994). This showing shifts the burden to the defendants to show that a reasonable official could have believed, in light of settled law, that his conduct did not violate the law. Id.

As discussed above, a jury might reasonably find that the individual officers' conduct violated the decedent's rights under the Fourth Amendment. In determining whether that right was clearly established at the time of the incident, the court considers

"whether the state of the law at the time of the alleged wrong gave the defendants fair warning that their alleged treatment of the plaintiff was unconstitutional." Davis, 478 F.3d at 1056 (internal citations omitted). There need not be a case or ruling exactly on point in order to put the officer on notice; some use of force is so inappropriate as to be self-evidently unreasonable and unconstitutional. Id. at 1057 (collecting cases); Blankenhorn, 485 F.3d at 481.

In this case, were the jury to credit the plaintiffs' version of events, there is no question that reasonable officers in Foppiano, Inskip, and D'Valentine's position would have known that their conduct violated the Fourth Amendment, "from an elementary understanding of the obligations of law enforcement officers toward all individuals in the community they serve as well as from a review of the well-established law." Davis, 478 F.3d at 1056-57. Since Graham (and prior, given that Graham relied on long-held principles of Fourth Amendment jurisprudence), it has been made clear to officers that a suspect's mere fleeing or resisting as well as being a suspect of a serious crime does not alone justify an exceptional amount of force against him. Instead, the force must be reasonable, which is to say that it must be at least roughly commensurate with that needed to subdue the suspect. The degree to which the suspect appears to be a threat to others, including the officers, is an important part of this calculus and requires the officer to consider whether the suspect is armed, his level of aggression, and myriad other facts that bear on the situation. See

1  Graham, 490 U.S. at 394-97.

2      Here, if the plaintiffs' version of events were credited, two

3  officers tackled an unarmed, confused man who believed they were

4  attempting to rob him. While he was face down on the ground, at

5  least one kneeled on his back, while two of the defendants hit him

6  in the back and head with a hand and a baton. Although he struggled

7  to free himself and grabbed Foppiano's gun magazine in the process,

8  he did not try to strike, push, or otherwise attack the officers

9  while they beat him when he was on the ground. Under Graham  if the

10  jury credits plaintiffs' evidence they might conclude that the

11  officers acted unreasonably.

12      This  conclusion  is  particularly  inescapable  given  that

13  precedent existed at the time of the incident that would have put

14  the  officers  on  notice  that  their  very  conduct  constituted

15  excessive force under the Fourth Amendment. In Drummond, issued two

16  years prior to the incident giving rise to this case, the Court of

17  Appeals  considered  an  excessive  force  claim  brought  against

18  officers who had seriously injured a mentally ill man by laying on

19  his upper torso while he was face down on the ground. There, the

20  plaintiff had acted "agitated," prompting the officers to decide

21  to take him into custody for his own safety. Drummond, 343 F.3d at

22  1054.  Although  the  plaintiff  may  have  posed  a  threat  to  the

23  officers prior to them obtaining control of him, he did not resist

24  the officers as they brought him to the ground and put handcuffs

25  on him. Id. at 1057-58. During the course of that event, however,

26  the officers "pressed their weight" on the plaintiff's upper torso,

impeding his ability to breathe. Id. at 1056. The Court of Appeals noted several cases in which individuals had suffocated in similar circumstances. Id. at 1057. As such, the court concluded that as a matter of law, the force the officers had used was excessive. Id. at 1058.

In light of this case, the officers here were on notice of the potentially lethal effect of kneeling on or compressing a suspect's back while he lay prone. Drummond also instructed them that such conduct was unconstitutional in light of the suspect's lack of physical threat to the officers or others. Although here the decedent's conduct was more severe than that of the Drummond plaintiff, given his apparent commission of felonies in view of the officers and his active resistance of them, Drummond plainly instructed that, "The officers -- indeed, any reasonable person -- should have known that squeezing the breath from a compliant, prone, and handcuffed individual despite his pleas for air involves a degree of force that is greater than reasonable." Id. at 1059.[6]

For these reasons, the law governing defendants' conduct was clearly established at the time of the incident, so as to preclude qualified immunity for defendants Foppiano, Inskip, and D'Valentine.

////

---

[6]It appears to make no difference to this analysis that the decedent here died from aspiration of his vomit while lying prone, rather than suffocation. The hazard appears the same. See Expert Report of Dr. Lawrence at 2 (defendants' expert, concluding that "[h]ad [the decedent] vomited while standing, and not during a physical altercation, he might not have aspirated and died").

### 3.    **Monell** Liability

Defendants County of San Joaquin and Sheriff Heidelbach move for summary judgment on the grounds that they cannot be liable under Monell. Municipal liability may be established in one of three ways. See Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir. 1992). A plaintiff may prove that the actions in question were conducted pursuant to an official custom, policy, or practice; that the individual who committed the act was an official with final policymaking authority; or that such an official ratified a subordinate's unconstitutional act. Id.; accord Monell v. New York Dep't of Soc. Serv., 436 U.S. 658, 691 (1978); Weiner v. San Diego County, 210 F.3d 1025, 1028 (9th Cir. 2000). An agency may not be liable on a *respondeat superior* theory, but only if there is evidence that there is "an affirmative link between the policy and the specific constitutional violation alleged." City of Oklahoma v. Tuttle, 471 U.S. 808, 821 (1985).

Here, plaintiffs alleged that defendants County of San Joaquin and Sheriff Heidelbach are liable under Monell for ratifying officer Foppiano's conduct and failing to train. See Compl. ¶¶ 30-32. In their opposition to defendants' motions, however, they clarify that their theory of liability is premised on an alleged failure to train.

A municipality can be liable for failure to train its employees in certain narrow circumstances. City of Canton, Ohio v. Harris, 489 U.S. 378, 387 (1989). Inadequate training may serve as a basis of § 1983 liability only when the failure to train

constitutes a deliberate indifference to the rights of those with whom the officers come in contact. Id. at 388. Deliberate indifference is shown where "in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights." Id. at 390. In resolving the issue, the court must inquire into the training program itself, as the fact that a particular officer acted improperly is not sufficient evidence for the purposes of Monell liability. Id. at 390-91. "[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." Id. at 391. Finally, the plaintiff must show a causal link between the inadequate training program and the ultimate injury. Id.

Here, plaintiffs have tendered no evidence of the training officer Foppiano received in this case. There is no evidence of what the County or Sheriff Department's training policy was nor any evidence tendered to the court as to whether Foppiano was instructed as to the use of force, what the contents of that instruction was, or any other evidence of information conveyed to him or not by his superiors regarding the use of force. Moreover, in their opposition to defendants' motion, plaintiffs state that "Defendant Officers ignored their training by leaving Mr. Gabales face-down. . . ." This belies plaintiffs' argument that faulty training causes the harm to decedent. Simply, as the Supreme Court has explained, although the officer's conduct may indicate his

1   inadequate training, it is legally insufficient evidence of the

2   training's adequacy and cannot alone support <u>Monell</u> liability. <u>City</u>

3   <u>of Canton</u>, 489 U.S. at 391.

4       Accordingly, defendants' motion is granted as to plaintiff's

5   second and third causes of action, which allege the County's and

6   Heidelbach's liability under § 1983.

7   **B.   State Law Claims**

8       In their remaining causes of action, plaintiffs allege that

9   defendants Inskip, Foppiano, and D'Valentine committed the torts

10  of assault and battery, violated California Civil Code § 51.7 and

11  were negligent. They also allege that Foppiano violated California

12  Civil Code § 52.1 and the County and Heidelbach negligently hired,

13  trained, retained, supervised, and disciplined its deputy sheriffs.

14      Defendants move for summary judgment on all of these causes

15  of action on the grounds that the action was filed beyond the

16  statute of limitations and that the individual defendants are

17  immune from liability. The court considers each of these defenses

18  in turn, then addresses the remaining causes of action

19  individually.

20      **1.   Timeliness of the Action**

21      Under California Government Code section 911.2, all claims

22  "relating to a cause of action for death" of a person must be

23  commenced not later than six months from the notice of the denial

24  of the claim by the government agency. Cal. Gov't Code §§ 911.2,

25  945.6(a). This limitations period applies to suits against public

26  entities and public employees. <u>Id.</u> § 950.6(b). Failure to commence

the suit within the limitations period operates as an absolute bar to a plaintiff's action. Schmidt v. S. Cal. Rapid Transit Dist., 14 Cal. App. 4th 23, 29 (1993).

Here, as noted above, the instant action consists of two consolidated suits, one initiated by Sonja Gabales and a minor and another brought by Ted Gabales and minors. The undisputed evidence is that Sonja Gabales and a minor filed a claim with the State of California on June 15, 2006. Walter Decl. Ex. B. It was received on June 20, 2006 and apparently denied on March 15, 2007. Id. Ex. D Sonja Gabales commenced her suit on July 5, 2007. Therefore, that action against the state-employed defendants (defendants Inskip and D'Valentine) was timely filed.

Sonja Gabales and a minor filed a claim with the County of San Joaquin on June 19, 2006, received the next day. Berry Decl. Ex. C. It was denied on October 31, 2006. Id. Ex. E. Therefore, when she filed her action in July 2007, it was untimely under Government Code section 945.6(a) as to the County of San Joaquin, Heidelbach, and Foppiano.

Ted Gabales and the minors named in his complaint filed a claim with the State of California on June 20, 2006 and with the County of San Joaquin the same day. Walter Decl. Ex. C; Berry Decl. Ex. B. His claim with the state was denied on September 27, 2006. Walter Decl. Ex. E. His claim with the county was denied on October 31, 2006. Berry Decl. Ex. D. Therefore, when he commenced his action on October 3, 2007, it was not within the limitations period as to any of the defendants.

1    Plaintiffs urge the court to overlook this on the basis that
2   "it is unfair for one of the Defendants to prevail on the defense
3   of the statute of limitations while Plaintiffs were required to
4   wait for the second Defendant, also a public entity, to respond to
5   their tort claim." Pls.' Opp'n to Defs.' Mot. for Summ. J. at 26.
6   While it is true that multiple public entities' responses to claims
7   months apart from each other likely creates a difficult situation
8   for a plaintiff, the California legislature has not provided that
9   this tolls the limitations period. See Cal. Gov't Code § 945.6.
10  Notably, the legislature has accounted for other events that may
11  extend the limitations period, such as the agency's failure to
12  respond to a claim for two or more years or the plaintiff's
13  incarceration. See id. This suggests that the legislature intended
14  that extension of the limitations period would only be permitted
15  in those situations for which it had been provided by statute. See
16  Dowell v. City of Contra Costa, 173 Cal. App. 896, 901 (1985)
17  (holding that the six-month limitations period "cannot be extended
18  by provisions outside the [Government Claims Act]").

19    Moreover, plaintiff has not directed the court to any
20  authority that would permit tolling in this instance. In fact, the
21  only authority the court has discovered has expressly held that an
22  action against one public entity is not tolled while the plaintiff
23  awaits action on a claim against another public entity. Id. at 903.
24  In light of this, the court concludes that the limitations period
25  against the county defendants was not tolled while plaintiffs
26  awaited their claims decision by the state.

28

1    Accordingly, defendants County of San Joaquin, Heidelbach, and

2   Foppiano's motion is granted as to all of the plaintiffs, as to

3   their fourth, fifth, sixth, seventh, and eighth causes of action.

4   Defendants Inskip and D'Valentine's motion is granted on those

5   causes of action as to plaintiffs Ted Gabales, S.V.G.G. & P.S.G.

6   only.

7        **2.   Immunity Under State Law**

8        Defendants Inskip and D'Valentine move for summary judgment

9   on the grounds that their conduct was protected under California

10   Government Code § 845.8 immunity. That section provides that no

11   public entity or public employer is liable for an "injury caused

12   by . . . [a] person resisting arrest." Cal. Gov't Code § 845.8(b).

13       The California courts have consistently interpreted this

14   section as immunizing an officer from suit where injury results to

15   a third party or to the suspect due to self-inflicted injury. See,

16   e.g., Ladd v. County of San Mateo, 12 Cal. 4th 913, 918-19 (1996);

17   Kisbey v. State of Cal., 36 Cal. 3d 415, 418-19 (1984). The

18   immunity does not extend to injuries to a person caused by the

19   officer's use of excessive force. Burden v. Snowden, 2 Cal. 4th

20   556, 568 n.17 (1992); Scruggs v. Haynes, 252 Cal. App. 2d 256, 266-

21   68 (1967); Ne Casek v. City of Los Angeles, 233 Cal. App. 2d 131,

22   135-36 (1965); see also Moor v. Alameda County, 411 U.S. 693, 724

23   (1973) (under California law, "an officer, while generally immune,

24   may become liable in damages, if he uses unreasonable force against

25   a citizen, in which event the municipality loses its immunity"

26   (dissenting opinion of Douglas, J.)). This is due to the fact that

29

1   section 845.8 immunity is a form of discretionary immunity, <u>Kisbey</u>,

2   36 Cal. 3d 415, and discretionary immunity does not protect "an

3   official[] who is in fact guilty of using his powers to vent his

4   spleen upon others. . . ." <u>Ne Casek</u>, 233 Cal. App. 2d at 135-36

5   (quoting <u>Gregoire v. Biddle</u>, 177 F.2d 579 (2d Cir. 1949) (opinion

6   of Hand, J.)); <u>see also</u> <u>Scruggs</u>, 252 Cal. App. 2d at 266-68

7   (section 845.8 immunity was intended only to encompass

8   discretionary immunity of officers and there is no discretionary

9   immunity under the statute or at common law for use of unreasonable

10  force).

11      Accordingly, defendants' Inskip and D'Valentine's motion is

12  denied on this basis.

13  **C.   Assault and Battery**

14      Defendants Inskip and D'Valentine move for summary judgment

15  on plaintiffs' fourth cause of action for assault and battery on

16  the grounds that it lacks factual support. As explained above, the

17  motion is granted as to plaintiffs Ted Gabales, S.V.G.G. & P.S.G.

18  due to untimeliness. As to plaintiffs Sonja Gabales and L.C., the

19  motion must be denied on this cause of action.

20      A plaintiff makes a prima facie case of assault and battery

21  by making the same showing required under a claim for excessive

22  force under 42 U.S.C. § 1983. <u>Munoz v. City of Union City</u>, 120 Cal.

23  App. 4th 1077 (2004); <u>Susag v. City of Lake Forest</u>, 94 Cal. App.

24  4th 1201 (2002); <u>Edson v. City of Anaheim</u>, 63 Cal. App. 4th 1269

25  (1998). Here plaintiffs have demonstrated that a factfinder could

26  reasonably conclude that Inskip and D'Valentine used excessive

1  force against the decedent, as explained above in the context of

2  plaintiffs' § 1983 claims. Consequently, defendants' motion is

3  denied as to plaintiffs Sonja Gabales and L.C.

4  **D.    Violation of California Civil Code § 51.7**

5      In their fifth cause of action, plaintiffs allege that

6  defendants violated California Civil Code § 51.7 by discriminating

7  against the decedent on the basis of his race. Defendants Inskip

8  and D'Valentine move for summary judgment on the grounds that

9  plaintiffs lack standing to assert this claim and that there is no

10  factual support for the claim.

11      Civil Code § 51.7(a) provides that "[a]ll persons have the

12  right to be free from violence . . . committed against their

13  persons or property" because of race. The California courts have

14  held that an action under this section is personal to the

15  discrimination victim. Coon v. Joseph, 192 Cal. App. 3d 1269, 1277

16  (1987); see also Rose v. City of Los Angeles, 814 F. Supp. 878,

17  882-83 (C.D. Cal. 1993) (relying on Coon). Based on this,

18  defendants argue that plaintiffs lack standing.

19      The court disagrees. The only California case relied on by

20  defendants was not a survivorship action. In Coon, the plaintiff's

21  claim was based on observing assault of his friend. Coon, 192 Cal.

22  App. 3d at 1272. In Rose, a federal district court relied on Coon

23  to hold that a claim under section 51.7 could not survive the

24  discrimination victim's death. Rose, 814 F. Supp. at 882-83. Coon,

25  however, does not stand for so broad a position and did not

26  expressly or impliedly, based on the facts before it, abrogate the

1  codified rule that a cause of action for a person is not lost upon

2  his or her death. Cal. Code Civ. Proc. § 377.20(a). Instead, the

3  decedent's cause of action may be maintained by his or her

4  successor, in a survivorship action.[7] Id. § 377.30. Accordingly,

5  the court is not persuaded that plaintiffs lack standing to assert

6  a claim under section 51.7.

7      The court agrees, however, that there is insufficient evidence

8  that section 51.7 was violated. In order to make a prima facie case

9  of unlawful discrimination under the statute, the plaintiff must

10  show that the defendant committed violent acts against the victim

11  or his property, that a motivating reason for the violent acts was

12  the victims's protected characteristic, that the victim was harmed,

13  and that the defendant's conduct was a substantial factor in

14  causing the harm. Austin B. v. Escondido Union Sch. Dist., 149 Cal.

15  App. 4th 860, 880-81 (2007). In order to meet the second element,

16  plaintiff must at least tender evidence from which an inference of

17  animus based on a protected characteristic may be made. Id. at 881;

18  see also Garrett v. City of Alameda, No. C-94-1134, 1995 WL 129239

19  at *4 (N.D. Cal. March 22, 1995) (evidence of defendant having made

20  racial derogatory statements to plaintiff sufficed to raise an

21  inference of racist motivation of subsequent assault); Bolluck v.

22  City of San Rafael, No. C92-1121-TEH, 1994 WL 621975 at *4

23

24      [7]The contrary result in Rose may have resulted from the
    plaintiff's inadequate briefing in that case. See Rose, 814. F.
25  Supp. at 883 ("Plaintiff does not cite any other authority [than
    Coon] and simply makes conclusory statements.").
26

32

(evidence that officer falsified a police report to state that white woman reported that plaintiff, an African-American male, "came on to her" "had racial as well as sexual overtones" sufficient to raise a genuine issue of material fact on this element).

In their opposition to defendants' motion, plaintiffs assert that defendants "subjected [the decedent] to excessive and unreasonable force motivated by his race." Pls.' Opp'n to Defs.' Mot. for Summ. J. at 25. Plaintiffs, however, have not directed the court to any evidence of this, including any evidence, such as statements or other conduct of the officers, from which an inference of racial animus would arise. See Austin B., 149 Cal. App. 4th at 880-81; Garrett, 1995 WL 129239 at *4; Bolluck, 1994 WL 621975 at *4. Plaintiffs have not even tendered evidence of the decedent's race.[8] Simply, they have not met their burden to defeat defendants' motion in this regard.

**IV. CONCLUSION**

For the reasons stated herein, the court ORDERS as follows:

1.   Defendants Inskip and D'Valentine's motion for summary judgment (Doc. No. 57) is GRANTED as to plaintiffs Ted Gabales, S.V.G.G. & P.S.G.'s fourth, fifth, sixth, seventh, and eighth causes of action. It is GRANTED as to plaintiffs Sonja Gabales and L.C.'s fifth cause of

---

[8]Plaintiffs alleged in their complaint that the decedent was Latino, but this was not admitted by defendants nor have plaintiffs tendered other evidence of the decedent's race.

33

1          action. It is DENIED in all other respects.

2     2.   Defendants County of San Joaquin, Heidelbach, and

3          Foppiano's motion for summary judgment (Doc. No. 58) is

4          GRANTED as to all plaintiffs' second, third, fourth,

5          fifth, sixth, seventh, and eighth causes of action. It

6          is DENIED as to plaintiffs' first cause of action.

7     3.   Defendants County of San Joaquin and Heidelbach are

8          hereby DISMISSED from this action.

9     IT IS SO ORDERED.

10    DATED:  September 3, 2009.

11

12

13    _____
      LAWRENCE K. KARLTON

14    SENIOR JUDGE
      UNITED STATES DISTRICT COURT

15

16

17

18

19

20

21

22

23

24

25

26

                              34